May it please the Court, Counsel. I'm Rick Smith on behalf of Juvenal Ceballos. Your Honors, we're asking this Court, and we believe that the Court should grant Mr. Ceballos a new trial based on the fact that the Court improperly admitted 4.4b evidence in the form of a small amount, a possession amount of methamphetamine that was found in a red Jeep. Second, that the Court improperly admitted under the under evidentiary rule 106 statements from the pre-sentence report author Stephen Krause that Mr. Ceballos was the source of two, two deliveries. And third, that I guess third and fourth, these two are connected, that number one, no probable cause existed for the arrest of Mr. Ceballos at his home as he sat in a green Pontiac Firebird on November 21st of 2002. And if the Court were to find that probable cause did exist, that he did not enter into a valid waiver of his constitutional rights as that waiver would have to be obtained pursuant to United States v. Gammaz. With regard to the 4.4b evidence, this was a possession amount of methamphetamine that was discovered in a red Jeep that was connected with Mr. Ceballos on November 8th. The house, his home, was subject of a search warrant that is substantially in dispute and was executed on November 21st. After the search of the house had occurred and no inculpatory evidence had been found in the house and Mr. Ceballos had been arrested, his wife was called and she came back home from work, and in that vehicle was found a small amount, a possession amount of methamphetamine. The Court said when we objected to it and asked the Court to rule it inadmissible, said that I think it is valid 4.4b evidence. We know it can go to motive, intent, or knowledge, but none of that was ever found. Counsel, let's assume that we agree with you because of a lack of connection between that particular amount of drugs and your client, since the wife was driving the car and she had certainly access to that car. Where does that get you in view of the fact that we have to review for harmlessness of an error, and here we have the confession, we have Negrete's testimony, we have the surveillance, how, weighed against that, what difference could it possibly have made to the jury? Well, number one, Your Honor, if you do look at the record, when that evidence came in by virtue of, well, actually, it had come in on direct examination of Catalina Ceballos and then Juvenal, but when it was used by the prosecution in this case, the questioning went, sir, to Mr. Ceballos, you delivered methamphetamine on September 3rd. No, I didn't. You delivered methamphetamine on November 8th. No, I didn't. And so that wasn't your methamphetamine in the vehicle. And it was essentially to call Mr. Ceballos or to show that he was lying about September 3rd and November 8th. The evidence with regard to those two events, September 3rd and November 8th, was also slim. In fact, the jury acquitted Mr. Ceballos, even if the Court says, well, we accept that he made this confession. Number one, the jury didn't believe it, because they would have had to have believed that he said that he was guilty of the September 3rd incident. They didn't believe Mr. Negretti with regard to the September 3rd incident. And the November 8th incident was very thin, and the dispute, frankly, much of the issue was whether or not there was a judged confession of Mr. Negretti, whether he said what he said, whether he said anything, and I guess, second of all, whether or not that statement should have even come in. So I believe that there is. It can't be – it wasn't harmless for that to come in. That was the only evidence of any substance, direct substance, that was connected at all with Mr. Ceballos. You know, the other thing was, that same argument was made by counsel with regard to the 106 evidence, saying that, well, we should be allowed to bring in a hearsay statement from the pre-sentence report author, whether or not the question to the – to Mr. Krauss was, did Mr. Negretti tell you that he had received a pound of methamphetamine from Mr. Ceballos on two occasions? And that was supposedly to complete a statement that Mr. Krauss made. We brought it up as impeachment evidence for a statement that Mr. – that Mr. Negretti had made on Krauss. When we crossed him, he said that he had – he didn't have any idea that the informant was working for the government, and that he had introduced Mr. Ceballos – or he had introduced the informant to Mr. Ceballos. And when we brought in testimony from the pre-sentence report author that contradicted that, then the Court allowed the United States attorney to ask Mr. Krauss if Mr. Negretti had said that Mr. Ceballos had given him drugs on two occasions. And when – when we made that argument, the government makes in its – in its response the argument that, well, all that did was confirm what Mr. Ceballos said in his own confession. But the fact is, is that's exactly why it was so prejudicial.  Just because – I mean, the Court characterized it as 106 evidence, but you don't get to produce evidence under the guise of that rule just to advance the theory of your case. It has to respond to some allegation that we've only introduced part of a statement with the intent to mislead and that it was out of context. Well, when the government says that this supported the confession, that's exactly why it's so prejudicial. That confession was hotly disputed. The jury didn't even believe that Mr. Ceballos had said that. Did Negretti otherwise testify to that same – did he testify to the pound deliveries? He testified to the two-pound deliveries. And this then again corroborated that. And the jury didn't believe Mr. Negretti. I mean, as far as September 3rd, they didn't believe it. Well, they're entitled to believe in part and not in part, right? And what we look at is whether with respect to the things they did believe, what would have been different? Well, I think, Your Honor, that without this – you know, a second hammer or a second shot at that, whether or not there was a delivery on November 8th and another bit of evidence that corroborated this alleged confession on behalf of Mr. Ceballos, I think that that is prejudicial. The confession itself, I mean, we get back to whether or not – I guess it really – I mean, we framed the question in two parts, you know, whether or not there was probable cause for the search. Was there probable cause for the arrest? I mean, the search warrant itself didn't ask for a search of the residents of 1310. Excuse me. The application for the search warrant didn't ask for that. Since no evidence was discovered as a consequence of the search at Jarden Drive, what difference does it make? Well, that's what gets them there in the first place, and then they arrest Mr. Ceballos. I agree. But they could have been walking by. I mean, that's – They could, I suppose, if they had probable cause. But I think that the way that I would analyze the search warrant in terms of the probable cause issue for Mr. Ceballos is that when you look at the search warrant itself, what does it say that – what is it about it that gives them probable cause to search in the first place? I mean, they talk about this activity. They don't even say – or having the opportunity to just sit down and write what probable cause they had. I mean, it can't be any different as to Mr. Ceballos. It's the same thing. Having the time to sit down and write about it. They don't ask for a search of his person. They don't ask for a search of the red Jeep, which is supposedly the incriminating evidence, the evidence that he drives the Jeep up to this 1941 Granger. And in fact, in the affidavit, it never even says that he's identified as the driver of that vehicle at 1941. Now, it does say that once that red Jeep returns to the house at 1310 that he's the driver, but there's no request for a warrant for the arrest of Mr. Ceballos. There's no request for a warrant for the search of the red Jeep. And in fact, the red Jeep isn't even in Attachment A, which is what they're asking to search. It still doesn't say that they're asking for a search of the red Jeep or anything connected with Mr. Ceballos. It all has to do with the vehicles that are associated with Mr. Negrete, and it seems like 1310 is just indicated as a place where you might find a vehicle associated with Mr. Negrete. That's it. There is no probable cause to search or to arrest Mr. Ceballos at that time. They didn't have it. They would have spelled it out, and they didn't, and it wasn't there. It just didn't exist. Even if Your Honors were to find that there was, as slim as it was, probable cause to arrest him, this is even – I guess another thing I might mention is it's two weeks later. I mean, nothing has developed in the meantime. But if we talk about how the rights were administered, and I'm relying on United States, because what the government will say is that, hey, look, we read them to him, all right? And I know how that goes, and Your Honors know how that goes. And it just – you read it off a card. Do you understand those rights? Yes. Okay. We're going to ask you some questions. And that's exactly what Uriel Mendoza said. I read him his rights, confirmed he understood, and that was it. That's it. Two hours, three hours earlier, it was 740, I think, when he was advised the first time, and then he was taken into, for questioning, into the DEA office. And there, did you – were you read your rights? Yes. Did you understand them? I understand. I don't have to talk to you. Do you know you have the right to an attorney? Yes. Do you want them read again? No. And then the questioning begins. He's not advised that he has the right or that anything that he says can be used against him. Now, I'm saying that. I know that he was – it was read to him the first time. Or at least that's what the evidence is. He's not advised that he has the right to an attorney at no cost. He's not asked, would you prefer to have an attorney here? He's not advised, you know, it's just another factor, I suppose, of his right to contact the Mexican consulate. And then he's questioned. Now, painstakingly means anything. And that's the sixth factor. Were those rights painstakingly administered? If it means anything, and if it's going to apply in any case, it should apply here, it means more than simply running through a recitation of the rights and saying, do you understand? It means asking, having a call equate. Because otherwise, I don't know how you get there. How do you get to painstakingly? If you don't have a call equate that goes over each factor, each important factor, and it is important, do you know that everything that you tell us can be used against you in a court of law? Do you know that we can appoint an attorney for you right here, right now? Counsel, did you want to save a little bit of time for that all? Your Honor, thank you. I'd like to save two minutes. Thank you. We'll hear next from the Governor. Good morning. And if it pleases the Court, Counsel, Mr. Smith. We have filed our response, and we've indicated obviously our position with respect to each of the issues raised. And I want to get to the first issue that Mr. Smith talked about, and that was this issue of whether the defendant was advised of his rights. The testimony both by way of the reports that were prepared and the testimony of trial was that Detective Uriel Mendoza read the defendant his rights in Spanish from a DEA card, which was exhibit one and admitted at trial. Outlines all of the rights which under Miranda need to be provided. Then it indicates that he acknowledged that he understood those rights, and then there's a gap between the next contact, which is Agent Garza of DEA. And he says, well, you read your rights. The defendant says, yes. Did you understand those? Yes. Do you want me to read those again? No. In fact, when he asked him, did you understand those rights, the defendant responded, I know I have the right to remain silent, and I know I don't have to talk to you. Later on, after he says, okay, do you want me to read them again? No. Do you understand? You can have an attorney present during this questioning. Yes. He says, no, he doesn't want one. Are you willing to talk to me? He says, yes. Now, Mr. Smith has indicated that the defendant wasn't advised that he had the right or that anything he might say would be used against him. Call the court's attention to the report of proceedings, the excerpts of proceedings at page 266. And I asked, and he was asked a question that, so the testimony that you were advised of your right to remain silent, nothing could be used against you, you could have a court-appointed attorney, that was never read to you. Well, I was told is that if I said something, it would be used against me. So the transcript, the testimony of the defendant at trial undermines Mr. Smith's statement that the defendant didn't realize that. Counsel, I'd like to move you to an area that is of concern to me, and that has to do with the 404B evidence, the drugs that were found in the Jeep that the defendant's wife was driving. In your view, what evidence, if any, ties him to that vehicle or ties him not to the vehicle, he had title to the vehicle, but ties him to the drugs within the vehicle as he did not have exclusive control of it? It was his vehicle, was registered to him. He was seen using it on the day that the delivery that he was convicted of, he was driving that vehicle, went to the Grady's house. But he wasn't driving it right before the drugs were found. His wife was driving it. That's right. She had joint opportunity or alternative opportunity to have been the source of those drugs. That's correct. So what do we do with that? Is there sufficient proof that the drugs were his to permit their introduction? I think, and I don't recall the wife's testimony, but I think the wife denies her ownership of the drugs at trial. The vehicle is being seized pursuant to statute, and the drugs are found during the inventory search of the vehicle. Therefore, when the officer finds the drugs in the car, there's not an issue of ownership. No, but it still has to be his. It doesn't help if, you know, the neighbor puts it there. So there has to be something to connect him to it. And if he and his wife are the only two and she testifies it's not hers, that may be sufficient. But it seems like the fact that it's found during an inventory search can't be the end of the question. And the basis of that, because it was methamphetamine, because the defendant was accused and associated through the other evidence to the evidence is more likely to have been his because of his involvement, because of the wife's denial of knowing about anything in the car and she was using it. Do you have a transcript reference for her testimony on that point? I do not, Your Honor. I did not look at the full transcript of the wife's testimony, and I'm not sure if it was or was not. In the defendant's testimony, the defendant testifies that only he and his wife used that vehicle. But then when pointed out, are the drugs your wife's? And he indicates no. And then, well, then that must mean they're yours. No. And then suddenly he says, I went to a party and I had a friend drive the vehicle. So I understand. He's now denying any tie to it. He now claims that although he had exclusive him and his wife, he then changes that and says, oh, by the way, I had this party. So your position would be that in terms of the judge's ruling, his initial testimony that only he and the wife had access and his denial and perhaps her denial that it was hers would have sufficed for the ruling that he made? I think his denial. His denial was, excuse me, he said, he was asked specifically, are these drugs your wife? No, they are not. Do you have a transcript reference for that? No, and I just read it. That's fine. I can find it. That's okay. It's in his testimony, and that would be at about two. Actually, it's on page 260. Okay. Thank you very much. So the information on the statement is that it always – another thing going back to that, Melissa, is at no time in the filing of any motion to suppress is the issue that he – about this advisement of rights that he denies that it ever occurred. It says, as the evidence says, he was advised of his rights in Spanish. It is only when we get to trial does the defendant actually step forward and say, I was never advised of my rights. That didn't happen. I was not advised of my rights. I didn't make that statement. So Mr. Smith also brings up at the – about the acquittal he's used as the jury acquitted him of the September 3rd because they didn't believe Mr. Negrete. I would beg to differ, and Mr. Smith and I have and probably will continue in the future to disagree on many things. But I don't know if it wasn't that they believed Mr. Negrete. I believe it was there was – other than his car parked outside of the defendant's residence for a period of time just before and after the delivery, there was no – the informant and surveillance never saw the defendant. Whereas, in the second November 8th delivery, the defendant is seen going to the residence in his vehicle. Mr. Negrete goes to – makes contact with him, goes to the rear passenger side, the second seat there, leaning into the car. As he stands up, law enforcement calls. Mr. Negrete answers it and indicates the drugs are here. But if Negrete testified that the defendant was involved in the September 3rd incident, the jury must not have accepted that testimony. They could have not accepted it or they could have said is that just because of his testimony that wasn't enough, whereas Mr. Negrete testifies that he was involved in November 8th, but we actually have the evidence, the surveillance of Mr. Negrete going to the residence – or, I mean, Mr. Ceballos going to the residence. His car is there. Mr. Negrete – So you're saying it could be because of the high burden of proof they found that it – maybe there was a preponderance but not beyond a reasonable doubt because there wasn't corroboration and it doesn't necessarily mean they believe Negrete was a liar. They just may not have believed there was quite enough. No. They literally feel there was a conspiracy and count three and left out count two, which was that. We contact Mr. Negrete. He's seen walking back to right in front of the defendant, Mr. Ceballos' residence. His car is parked there. But because of moving surveillance, you can't stop and see. Nobody saw him go in or out of the residence. And I think that what they did was they said, well, over here, the next one, you actually see him on the move. The contacts both going to the house and then later Mr. Negrete goes to Mr. Ceballos' house, makes contact with him at the front door. They go out of the house. They walk to the side of the house. They get into a car that's parked in the side of the house, and they spend 15 minutes to get up Mr. Negrete. And I believe that we argued that the reason that they found him guilty of that was because that visual, that kind of real contact was sufficient for the jury. They had concerns about the second, again, because we didn't talk to the jury. We'd speculate. But I think that because they found him guilty of the conspiracy and the delivery based on the same testimony, because Mr. Negrete said Mr. Ceballos was involved. He brought the dope to my house, and that was what I delivered. So if they didn't believe him, they either didn't believe him part or all. It's kind of hard to see how they did that. But I think that's what the speculation of the government's part would be, is that that's what happened, that they saw Mr. Ceballos. They saw videotape of his contact with Mr. Negrete. And Mr. Smith also raised the issue about the under 106, the admission of the parts of the pre-sentence report. And they challenged that. They indicate that it just confirms the defendant's statement. The thing about it is, is the statement was that he introduced his source to the informant. And the only reasonable conclusion that one could reach from that statement and arguing that statement when you have Mr. Negrete on the stand is that Mr. Ceballos was not the source. Counsel, I don't understand how testimony can ever lead to 106 evidence. I'm looking at the rule itself. It appears to pertain only to the introduction of a document or a writing and then the completion of that document or writing, but not with respect to testimony. Do you understand it differently than that? And if so, on what basis? It says when a writing or recorded statement or part thereof is introduced by the party. And I think the basis of that was is these statements are contained within a written document. That's not what it says. It says when the writing or document is introduced, not when somebody refers to it or there's testimony concerning it. Is it your position that it kicks in just because there is testimony concerning things that are also found in a writing? Yes, because the writing itself, the full pre-sentence report, because it is a document, it is protected. The court are not going to allow the full document to be brought into the court. I understand that. And so there was a writing. There was a document that could have been brought into the court. I'm looking for the legal proposition. Do you have a case for the proposition that Rule 106 can kick in, in the absence of the introduction of an exhibit in the form of a writing or document? Do you have any case that supports your specific theory of how to read it? No, I have no specific. I just think it would be is that the document itself is the parties agree the document exists, that the writing, the statements existed in the form of that, and the testimony was elicited to just that section, portion of it, the statement, the interview of Mr. Negrete, rather than the admission of the document. But the testimony and Mr. Smith eliciting that in a government's response were based on the fact that there did exist a written record, a written statement, which had I assume the parties had said, I want to enter this. They could have. Before your time is up, let me quickly ask you then, assume for the sake of this question that we find there was 106 error, or there was error in the admission of those hearsay statements. Why would that mistake, if it is a mistake, be harmless error? It would be harmless error because the harmless error statute or the harmless error standard is it more probable, if it is more probable than not, that the erroneous admission of the evidence did not affect the jury's verdict. In this case, the admission of the statements were just, they were testified to. Mr. Ceballos, there was testimony that Mr. Ceballos had made this statement that he admitted to delivering drugs to Mr. Negrete. He identified Mr. Negrete. There was also testimony by Mr. Negrete that Mr. Ceballos was involved in that. There was visual surveillance of Mr. Ceballos going to Mr. Negrete's residence and entering the vehicle and having calls saying that the drugs are here. So there was substantial and significant evidence outside of that, that those were just, they confirmed what was already, had already been actually testified to up until that point in time. The error would be that the verdict would not have been affected because even if you removed that, this evidence still comes in. The confession, the testimony, the surveillance, that's all been testified to. That's all been presented. And upon that, there would have been a sufficient basis to find the defendant guilty. Thank you, counsel. Thank you. I believe that Mr. Smith has some rebuttal time remaining. And just as a preview, I think with everyone's indulgence, I would like to take a break after this argument with my colleagues. Thank you. The cite to the record of Catalina Ceballos' testimony is on page 276. And then Mr. Hubenow Ceballos' testimony immediately follows that. And it is, in essence, Hubenow saying, I guess this is the cross-examination by Mr. Haggerty. And the cross is essentially, you sold drugs on September 3rd. No, you sold drugs on November 8th. You told Detective Garza that you dealt in eight balls of cocaine. And he said, no, I didn't. And then Mr. Haggerty said, and I suppose that that methamphetamine wasn't yours either, and then created that issue. The statement that Mr. Haggerty refers to from Mr. Ceballos, if I said something that would be used against me, that statement was made at trial. I recall that trial in this case happened to be about four years after the original statement. There was never any statements to that effect at the time of the waiver hearing of the Miranda hearing. And, frankly, I don't know how much veracity we can give to it four years later in terms of recollection and Mr. Ceballos' sophistication. You want to undermine your client's veracity when it's to his advantage but not when it's not? Well, I don't want to undermine his veracity. I'm saying that it's just that when we're talking about four years later in a separate, in a hearing where he's being cross-examined, I think that that came out during cross-examination as far as what was said, if anything. And Mr. Ceballos was, frankly, disputing whether he said anything at all. I think that it's just so far removed from that actual hearing that it doesn't carry the same weight or the weight that Mr. Haggerty wants to describe to it. The other thing was, in terms of the evidence, I mean, he keeps talking about this red Jeep being and how important that was, that there was surveillance. There was also surveillance. There was the same kind of things that were occurring on November 8th were occurring on September 3rd. November 8th, there was two other vehicles that went to that residence during the same time period and prior to this call where he says the drugs were there. If they had probable cause, if they would have believed that Juvenal Survios was involved at that point in time, if they had the evidence at that time, they would have asked at least for permission to search the red Jeep. They would have asked at least for an arrest warrant for Juvenal Survios or named him in the warrant. They didn't have it. Okay. Thank you, counsel. You have exceeded your time. And I think we understand your position. Thank you. The case just argued is submitted. We appreciate the arguments of both counsel. And we will take about a 10-minute break before continuing with the calendar. Thank you.
judges: Canby, Graber, Gould